IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| NEBRASKA HIGH SCHOOL PRESS ASSOCIATION, INC., et al., | |
| Plaintiffs, | 4:23-CV-3043 |
| vs. | MEMORANDUM AND ORDER |
| NORTHWEST PUBLIC SCHOOL DISTRICT, et al., | |
| Defendants. | |

This matter is before the Court on the defendants' motion to dismiss (filing 10) the plaintiffs' complaint (filing 1) pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). The Court will grant this motion.

## I. BACKGROUND

During the 2021-2022 school year, the plaintiff, Marcus Pennell, was a senior at Northwest Public High School in Grand Island, Nebraska, and a student reporter for the school's newspaper, the *Viking Saga*. Filing 1 at 3. During his tenure with the paper, Pennell wrote an editorial on "the Florida Parental Rights in Education Act, commonly known as the 'Don't Say Gay' law," which had recently been signed into law. Filing 1 at 11. In the article, Pennell wrote about "gender identity" and "the history of LGBTQ+ rights." Filing 1 at 12. The article was published in the *Viking Saga* on May 16, 2022. Filing 1 at 12.

The next day, members of the school district's Board of Education allegedly exchanged emails discussing the newspaper and some of its articles. Filing 1 at 13. The conversation began when one member asked if anyone had

read the school paper and attached a picture of Pennell's article and two other articles titled "Science of Gender" and "Pride and Prejudice: LGBTQIA+." Filing 1 at 69-71. Dan Leiser—the Board's president—allegedly responded that he was "upset" with students using the "school as a platform for expressing their opinions." Filing 1 at 72. He went on to say: "I'm hot on this one, because it is not ok. The national media does the same crap and I've had enough of it. No more school paper, in my opinion." Filing 1 at 72.

On May 19, the school allegedly issued a directive terminating its newspaper class and the *Viking Saga*, explaining that "no alternative newspaper class would be offered." Filing 1 at 12. According to the plaintiffs, the defendants later tried to disguise their motive for this decision by claiming the newspaper was only "temporarily paused" for a number of reasons. Filing 1 at 87. Still, the defendants claim the newspaper course and publication of the *Viking Saga* have since resumed after being paused for one semester. Filing 12 at 1.

Pennell and the Nebraska High School Press Association filed this case, bringing three separate claims under 42 U.S.C. § 1983, alleging that the Northwest Public School District and its superintendent, Jeffrey Edwards, violated the First Amendment when they terminated the newspaper course and publication of the *Viking Saga* because of Pennell's article and other LGBTQ+ related content. Filing 1 at 14. More specifically, the first two claims allege that the defendants engaged in viewpoint discrimination and retaliated against Pennell for his protected speech. Filing 1 at 19-20. Additionally, both plaintiffs allege that the defendants' decision to cease publication of the newspaper violated their First Amendment right to receive information. Filing 1 at 20. The defendants have moved to dismiss these claims. Filing 10.

2

## II. STANDARD OF REVIEW

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges whether the court has subject matter jurisdiction. The party asserting subject matter jurisdiction bears the burden of proof. *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010). Under Article III, § 2 of the U.S. Constitution, federal courts only have jurisdiction to entertain cases and controversies. *Dalton v. JJSC Props.*, LLC, 967 F.3d 909, 912 (8th Cir. 2020). Standing is an essential and unchanging part of the case-or-controversy requirement of Article III. *Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1119 (8th Cir. 2007) (citations omitted).

Rule 12(b)(1) motions can be decided in three ways: at the pleading stage, like a Rule 12(b)(6) motion; on undisputed facts, like a summary judgment motion; and on disputed facts. *Jessie v. Potter*, 516 F.3d 709, 712 (8th Cir. 2008). A court deciding a motion under Rule 12(b)(1) must distinguish between a "facial attack'" and a "factual attack." *Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015). In a facial attack, the Court merely needs to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction. *Id.* Conversely, in a factual attack, the existence of subject matter jurisdiction is challenged in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, may be considered. *Id.* at 914. Overall, the court has substantial authority to determine whether it has jurisdiction. *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

3

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* While the Court must accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party, *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012), a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. *Iqbal*, 556 U.S. at 678. Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Id.* at 679.

### III. DISCUSSION

The defendants argue the plaintiffs lack standing to assert their First Amendment claims. Filing 11 at 9. At the dismissal stage, the plaintiffs must allege sufficient facts to support a reasonable inference that they can satisfy the elements of standing. *Missouri v. Yellen*, 39 F.4th 1063, 1068 (8th Cir. 2022). Standing requires a plaintiff to establish (1) an injury in fact, (2) a causal connection between the injury and conduct complained of, and (3) that the court is likely able to redress the plaintiff's injury. *See id.* Standing is determined at the time the action commences, as the inquiry "remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008).

The Eighth Circuit has outlined what is required to establish an injury in fact:

> A plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and

4

> actual or imminent, not conjectural or hypothetical. . . . [T]hreatened injury must be certainly impending to constitute injury in fact, and . . . allegations of possible future injury are not sufficient.

*Missouri v. Biden*, 52 F.4th 362, 368 (8th Cir. 2022). It is also "fundamental that the plaintiff himself . . . suffered the injury he seeks to redress." *Plymouth Cnty. v. Merscorp, Inc.*, 774 F.3d 1155, 1158 (8th Cir. 2014). Finally, for an injury to be redressable, "it must be more than merely speculative that the relief requested would have any effect to redress the harm to the plaintiff." *Hall v. LHACO, Inc.*, 140 F.3d 1190 (8th Cir. 1998).

### 1. PENNELL'S STANDING TO ASSERT VIEWPOINT DISCRIMINATION AND RETALIATION CLAIMS

Pennell claims the defendants engaged in viewpoint discrimination and retaliated against him when they terminated the newspaper class and the *Viking Saga* because of the viewpoints he (and others) expressed regarding LGBTQ+ issues. Filing 1 at 19-20; filing 16 at 19. However, the timing of this allegedly unconstitutional decision raises unique standing issues. While Pennell was a student, he participated in the newspaper course and his article expressing his viewpoint was published in the *Viking Saga*. Filing 1 at 11-13. Only *after* Pennell graduated did the defendants terminate the newspaper course and cease publication of the *Viking Saga*.[1] The defendants argue that

---

[1] Whether Pennell had already graduated when this decision was made is a critical fact in determining whether he has standing to assert these claims. As stated above, the defendants allegedly made this decision on May 19. Filing 1 at 12. And the plaintiffs appear to admit

5

Pennell "cannot plausibly allege an injury-in-fact stemming from actions his former school took after he graduated." Filing 11 at 8; filing 19 at 6. In these circumstances, the Court must agree.

Pennell's alleged injuries stem from his expulsion from the alleged public forum *as a graduate*. Specifically, Pennell alleges he planned to continue contact with the *Viking Saga* after graduation by serving as a mentor, volunteering as an interviewee for articles, and writing as an outside contributor. Filing 16 at 3. However, the defendants' discriminatory and retaliatory termination of the newspaper course and its publication prevented him from doing so. Even if true, the Court cannot reasonably infer from these allegations that Pennell suffered an invasion of a *legally protected interest* that is concrete and particularized.

As a graduate, Pennell does not have a legally protected interest in the school's course offerings, including the newspaper course. Traditionally, only students and parents have standing to challenge the constitutionality of school policies and practices—including curriculum decisions—that threaten to injure students' educational interests and opportunities, as these are the individuals directly affected by such decisions. *See Liddell v. Special Admin. Bd. of the Transitional Sch. Dist. of St. Louis*, 894 F.3d 959, 965-66 (8th Cir. 2018). Thus, the defendants' decision—even if done to regulate specific viewpoints—cannot be said to have infringed upon Pennell's legally protected interests. Instead, any injury Pennell may have suffered from this curriculum

---

this decision occurred after Pennell graduated. Filing 16 at 1, 9. In an abundance of caution, and to the extent there is any dispute regarding this fact, *see* filing 16 at 2, the Court relies on the academic calendar submitted by the defendants which shows Northwest's graduation occurred on May 15, days before the termination decision was made. Filing 12-5.

decision was, at best, an "undifferentiated public interest" in the administration of public education, which is not sufficient to establish standing. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 574-77 (1992).

And just because Pennell claims this decision was motivated by his speech does not mean that, as a non-student, he sustained a concrete injury. Pennell attempts to avoid this conclusion by alleging the *Viking Saga* is a designated public forum that he was entitled to participate in, even as a graduate, and that the defendants' discriminatory conduct has chilled him (and during its temporary closure, completely prevented him) from expressing his viewpoints in the forum. Filing 16 at 17. Accordingly, whether Pennell has standing to bring claims based on his exclusion from the forum, depends entirely on whether he correctly concluded he has a legally protected interest in accessing the forum as a graduate.

The First Amendment does not guarantee access to property simply because it is owned or controlled by the government. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n* 460 U.S. 37, 46 (1983). Instead, the "existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Id*. at 44. Therefore, to determine the extent of citizens' right to access a certain forum, the Court must determine the nature of the forum at issue. *Bowman v. White*, 444 F.3d 967, 974 (8th Cir. 2006).

Designated public forums are created when the government intentionally opens up a nonpublic forum "to expressive activity for a limited purpose such as use by certain groups or use for discussion of certain topics." *Id*. at 975. Nonpublic forums—which include those not classified as either a traditional or designated public forum—allow the government to freely restrict

7

speech as long as such restrictions are reasonable and viewpoint-neutral. *Id*. High-school-sponsored publications, that are reserved as a supervised learning experience and produced as part of the educational curriculum, are typically a nonpublic forum. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 268 (1988).

This designation allows schools to retain authority and refuse to sponsor speech that substantially interferes with their work—including speech that might reasonably be perceived to advocate any position other than neutrality on matters of political controversy, or speech that is poorly written, inadequately researched, vulgar, or unsuitable for immature audiences. *Id*. at 271-72. Still, such publications may be deemed a public forum if school officials demonstrate a clear intent to open the pages to "indiscriminate use" by the student reporters, or by the student body generally. *Id*. at 267. But the government's inaction or permission of limited discourse does not create a public forum. *Id*.

Pennell makes several allegations in an attempt to establish that the defendants intentionally established the *Viking Saga* as a designated public forum. Specifically, he alleges:

- The newspaper class curriculum developed by the faculty advisor did not require approval or control by the defendants;

- The newspaper class curriculum developed did not provide any control or guidance over the content of publications of the *Viking Saga*;

- The defendants did not adopt any policies governing the operation, publishing, or content of the *Viking Saga*, thereby delegating control of the content to the student staff;

8

- The *Viking Saga* would occasionally publish student pieces from students not enrolled in the newspaper class; and

- In the side column of the *Viking Saga*, the publication intentionally and indiscriminately welcomed and encouraged outside submissions, suggestions, or letters to the editors from the student body and community readers at large.

*See generally* filing 1. But these claims are either refuted by materials included with Pennell's complaint or are insufficient to reasonably infer the defendants clearly intended to establish the *Viking Saga* as a public forum. In fact, many of Pennell's allegations demonstrate the similarities between the newspaper program at Northwest and that at issue in *Hazelwood*, which was deemed a nonpublic forum.

According to Pennell, the *Viking Star* is a "student newspaper" developed by student writers enrolled in the school's newspaper class. Filing 1 at 6; filing 16 at 2. The course is offered as a "part of the educational curriculum" to allow students "to develop experience teaching, writing, researching, editing, and publishing long-form journalistic articles." Filing 1 at 7. In this way, the *Viking Saga* provides student writers with a mechanism to gain journalistic skills and share information with the paper's "intended audience"—Northwest students. Filing 1 at 5-8. Students enrolled in the course completed lessons, assignments, and activities in addition to their work on the *Viking Saga*. Filing 1 at 7, 28-59. Accordingly, student reporters "received corresponding class credit and a grade for completion of the class." Filing 1 at 7. In sum, there is no dispute that the newspaper course and the *Viking Saga* were established as part of the school's educational curriculum.

9

And despite the plaintiffs' conclusory assertions, the Board's policies evince that the newspaper class's curriculum and materials were ultimately controlled by the defendants. The power to select curriculum and educational materials is delegated to the Superintendent. Filing 1 at 25. All instructional materials must be in accordance with the Board's policies and philosophies. Filing 1 at 25. And while the Board's policies allow assistance from staff to develop, select, and approve educational materials, that does not mean the newspaper course's curriculum was not subject to the defendants' control and approval. Filing 1 at 25.

It is, of course, common practice that teachers select instructional materials for their classrooms within the parameters and policies provided by the local and state Boards of Education. Filing 1 at 25. Such delegation is necessary for schools to function effectively and efficiently. And any "inaction" by defendants—specifically Pennell's allegations that they had not required their explicit approval of the course's curriculum or the students' articles—does not imply that they intended the student newspaper to be a public forum.

To the contrary, the facts alleged support the inference that the defendants intended to reserve the *Viking Saga* as a supervised learning experience. The school appointed a teacher to serve as advisor to the *Viking Star*. Filing 1 at 5. The advisor was responsible for editing students' articles, and students were *required* to accept these edits if the advisor determined they were needed to make the article grammatically correct or journalistically sound. Filing 1 at 6. That the students had some authority over the paper's content to develop leadership and journalism skills does not imply "a decision to relinquish school control over that activity." *Hazelwood*, 484 U.S. at 270. Nor do general district policies (1) encouraging the consideration of diverse

10

viewpoints, and (2) instructing teachers on how to deal with controversial topics in the classroom, reflect a clear intent to expand a curricular newspaper into a public forum. *Id.* at 269.

Additionally, that the *Viking Saga* would occasionally publish pieces from students no longer enrolled in the class and encouraged outside submissions from the student body and community readers, cannot be reasonably inferred as school authorities opening the paper for "indiscriminate use" by student organizations or the general public. *Id.* at 267. Permitting limited discourse does not transform a nonpublic forum into a public one. *See id.* And the *Viking Saga* clearly reserved its intended purpose of educating student reporters by establishing that outside contributors did not have indiscriminate access, as it reserved the right to print (or not print) any submission. Filing 1 at 64.

In conclusion, Pennell has not alleged facts from which the Court can reasonably infer that the defendants intended to open the *Viking Saga* up for indiscriminate use, thereby creating a public forum. Thus, even if the defendants' decision to terminate the paper prevented Pennell from participating in the forum as a graduate, this "injury" does not amount to an invasion of a legally protected interest. Stated another way, Pennell does not have standing to allege he was injured by the closing of a non-public forum in that he had no constitutionally protected right to participate. At least in these specific circumstances, that Pennell was prevented (or chilled) from submitting an article for consideration[2] by a non-public forum that had no obligation to

---

[2] Additionally, any allegations by Pennell that he was chilled from continuing contact with the *Viking Saga* after his graduation as a mentor or interviewee are similarly insufficient to

11

publish his article is not concrete and too speculative an injury to establish standing. To conclude otherwise would be to diverge from precedent preventing the general public from challenging curricular decisions, and expose schools to increased liability for terminating student newspapers.[3]

While Pennell primarily frames his claim as analyzed above—that the defendants' actions not only chilled but completely prevented him from *engaging in the Viking Saga*—he briefly alleges another injury, that because of the defendants' retaliatory animus he now experiences "fear and trauma when speaking publicly about his gender identity or on LGBTQ+ issues in other mediums." *See* filing 16 at 17-18. The Court does not, in any way, question the legitimacy of the anxiety or fear Pennell may experience when speaking on these issues. However, any hesitancy to speak on these issues at

---

establish standing. That he is unable to participate in this nonpublic forum in the way he desires does not amount to an invasion of an interest protected by the First Amendment.

[3] This does not mean the Court cannot imagine a scenario where a member of the public could possibly have standing to challenge a school's decisions regarding a nonpublic student newspaper. Speech restrictions in nonpublic forums must still be reasonable and viewpoint-neutral. *Bowman*, 444 F.3d at 976. So, for example, if the *Viking Saga* published articles from community contributors on a particular topic but refused to publish an article addressing similar content because of the specific viewpoint expressed, that *could* confer that community member with standing to challenge that decision. *See Planned Parenthood of S. Nev., Inc. v. Clark Cnty Sch. Dist.*, 941 F.2d 817 (9th Cir. 1991). Such an injury would be more concrete and particularized than a claim that one is generally chilled from submitting articles for consideration by a nonpublic forum. However, these are not the allegations presented to the Court. Pennell does not allege that he has attempted to submit an article for consideration since his graduation and the paper's re-opening. And trying to speculate as to what such a claim could look like—whether the newspaper would publish the article or its reasons for not doing so—is much too speculative, and not the Court's role.

12

his college or in his community is a subjective fear insufficient to establish standing, as he has not alleged a credible threat that the defendants could take unlawful retaliatory actions against him in these forums. And any fear he may have in reaching out to the *Viking Saga* to participate in its programming, again, does not amount to an allegation that he is chilled from engaging in conduct "affected with constitutional interest." *Id*. For those reasons, these claims also do not establish an injury in fact for Article III purposes, and the Court finds Pennell does not have standing to bring his viewpoint discrimination or retaliation claim.

### 2. PENNELL AND THE NEBRASKA HIGH SCHOOL ASSOCIATION'S RIGHT TO RECEIVE INFORMATION CLAIM

Finally, both Pennell and the Nebraska High School Press Association claim the defendants' termination of the *Viking Saga* violated their First Amendment right to receive information. Filing 1 at 20. Specifically, they allege they have a right "to receive the information and ideas of the publication." Filing 1 at 21. Additionally, the Nebraska High School Press Association claims this termination prevented it from fulfilling its mission: reaching Northwest students in the newspaper class, promoting high school journalism, and evaluating the *Viking Saga* at competitions. Filing 1 at 21-22. The defendants argue, however, that both plaintiffs lack standing to bring this claim because they have failed to identify a "willing speaker." Filing 11 at 13-14.

Where a willing speaker exists, the protection afforded by the First Amendment is to the communication, its source, and to its recipients. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). To have standing to assert a right to receive speech, a plaintiff must

13

show that there exists a speaker willing to convey the information. *Stephens v. Cnty. of Albemarle*, 524 F.3d 485, 492 (4th Cir. 2008). This is because the reciprocal right to receive information only exists where there is infringement on the right of a willing speaker. *Pa. Fam. Inst., Inc. v. Black*, 489 F.3d 156, 165 (3d Cir. 2007). Requiring plaintiffs to establish that an individual subject to the alleged speech restriction would have otherwise spoken ensures "there is an injury in fact that would be redressed by a favorable decision." *See id.*

The plaintiffs identifying themselves as willing speakers is not sufficient to establish standing in this action. The plaintiffs allege they desired to, and have the right to, receive information published in the *Viking Saga*. This makes them willing *listeners*. However, as outlined above, neither plaintiff, even if willing, has a right to speak in the *Viking Saga*. Thus, neither can credibly allege they *would* have spoken in the forum but for the defendants' conduct. And the various ways in which the plaintiffs wished to interact with the *Viking Saga* and its student reporters do not change that fact. Those facts may make them willing mentors, advisors, promoters, etc., but not willing speakers.

Likewise, Kirsten Gilliland, who served as the faculty advisor to the *Viking Saga*, is not a willing speaker. Standing is determined at the time of filing. At this time, however, Ms. Gilliland no longer served as the paper's faculty advisor. Filing 1 at 16. Accordingly, she had no connection to the *Viking Saga*, and therefore, is not a willing speaker for the purposes of this claim. For this reason, the Court will also dismiss the plaintiffs' right-to-receive claims for lack of standing.

That being said, the Court reiterates that these conclusions are reached as related to standing. This Order in no way decides whether a plaintiff with

standing to challenge the defendants' actions could state a colorable First Amendment claim. The peculiar circumstances of this case impact Pennell's ability to litigate these claims. His ability to do so may have come down to just a matter of days. Thus, school administrators would be wise to remember that policies and decisions to restrict speech in student newspapers, even those operating as nonpublic forums, may run afoul of the First Amendment if they reflect "an effort to suppress expression merely because the public officials oppose a speaker's view." *Bowman*, 444 F.3d at 976. Accordingly,

IT IS ORDERED:

1. The defendant's motion to dismiss (filing 10) is granted.

2. The plaintiffs' complaint is dismissed without prejudice.

3. A separate judgment will be entered.

Dated this 16th day of October, 2023.

BY THE COURT:

John M. Gerrard
Senior United States District Judge